Houston, Against Workers' Comp'n Commission, 511-0117. Counsel, please. Good morning, Your Honors. My name is Eric Kirkpatrick, and I represent Sam Houston in this case. I think there are two aspects to this case. One is, obviously, I think there's an issue on the manifest weight of the evidence. But the second issue is that I think that the Commission, when the decision was written, they placed too much weight on the medical evidence of permanent and total disability, which I don't think led me to believe that they did not apply the proper standard when determining whether this person fell into the odd lot category of permanent and total disability. Background on the case, very briefly, is this gentleman was injured at work. He had a fusion to his cervical spine at the hand of Dr. Euclid. He then was given restrictions of no lifting over 20 pounds frequently, 30 pounds occasionally, with minimal overhead use of his arms. That was Dr. Euclid's. There was continued treatment by Dr. Matthew Gornett, who thought that additional surgery needed to be done at a different level. But there was also pain management that was done. And Dr. Daveh suggested a diagnosis of chronic belled neck surgery syndrome. Without getting too much into the background now, one reading this record and the decision, I think comes to the conclusion that the Commission, to be blunt, had some problems with the credibility of the claimant as well as the treating physician. Given that that is, in fact, the case, what is your response that those matters are strictly within the province of the Commission? They had some problems with the testimony of the claimant and the treating physicians. OK. I'll address that now. But since I was going to address the credibility of the treating physician, I'll go ahead and address that issue first. With Dr. Shinnewark, that's the doctor that they kept pressing on that they did not find him credible because my client had written a letter to the doctor and asked for his opinion about the permanent total disability. Whether they find that doctor credible or not, they should find him credible. Whether they find him credible or not, that has nothing, his opinion shouldn't have any bearing on the odd lot determination in this case. They looked only to Dr. Shinnewark's testimony. They looked only to the idea that they did not find him credible to the exclusion of any of the rest of the doctors. That's the problem, in a nutshell. When they did the odd lot analysis, they referred to the fact that the arbitrator relied on Shinnewark, and they found Shinnewark wasn't credible. That Dolores Gonzalez relied on Dr. Shinnewark's opinion, and therefore, it was all gone. But that's not all that the arbitrator considered, and that's not all that Dolores Gonzalez considered. As an example of that, there's no mention in their analysis of the odd lot category of Dr. Euclid's restrictions. There's no mention in the medical evidence analysis of Dr. Gornett saying that he thought this gentleman was unemployable. There's simply no mention in there about Dolores Gonzalez indicating that she reviewed all of the medical records, reviewed the restrictions, reviewed his age, his education, his previous work experience, and then came to the conclusion that he was not employable in a reasonably stable labor market. The only thing that they seem to mention is Dr. Shinnewark. Now, what they also failed to mention was, well, that was a letter solicited. Dr. Shinnewark's opinion was given in response to a letter from my client. They also failed to acknowledge in their decision that Dr. Shinnewark would not fill this thing out without seeing this gentleman another time. He wasn't going to just write this guy off as permanently and totally disabled without him coming in. He gave the gentleman a full examination, and then he considered the other medical records. He considered his other treatment in the past on this gentleman before he ever wrote a letter to say that this gentleman was permanently disabled. On the issue of the commission stating that my client was trying to solicit an opinion from Dr. Shinnewark during the time he was doing the job search, look at the dates for the job search. I think that you'll find that that opinion wasn't given until just about the time that the vocational efforts ended. What about the job search you just alluded to? Didn't the commission find that the claimant had not engaged in a diligent job search? He made some derogatory comments about the jobs that were offered. Didn't he say something about he thought he was a circus clown or something with the jobs that they had offered him? Yes. Didn't that catch you on how that would trouble the commission? No. No. I think what they said was the commission found that the petitioner's job search was disingenuous. And my question would be back to the commission is, how is a person disingenuous in their efforts when they've applied at 400 places and, by testimony, applied at every single one of the places that their vocational people sent him to? He applied at all of them. What about the ones that Hammond referred him to? No, he applied at all of those. So he made these derogatory comments and in connection with what? Well, I think if you take a gentleman that has worked as an iron worker since 1979, all the way through age 47, many years, you'll find that these guys do think it's degrading. It is hard for people to go from making a good living, doing something they've enjoyed their entire career, to have it pulled out from under them and it be suggested to them that they be a waiter at McDonald's or white tables at the McDonald's Taco Bell. It's degrading to them. And I think that's just a human factor that is involved in all of this. But it doesn't affect this gentleman's attempts to search for work. And while I'm on that search for work, Hammond's testimony, he saw this gentleman two times. The other person that actually dealt with this man was a social worker, Ms. Simone. He applied to every one of the jobs. When it came down to determining what this guy could do, in Hammond's deposition, he said there were assembly jobs that this guy could do. Now, I further asked him how many of those jobs were there. And I think he says there were two assembly jobs in all of those 400 jobs that he had given him, I mean that Simone had led him to. You mentioned a moment ago the credibility of the petitioner. I'm going to submit to you that things that they referenced, the medication issue, if that is a concern, to me that's not an issue of credibility. When he was asked about that on the stand, he didn't deny it. He said exactly what he did. He admitted to it. That, to me, doesn't suggest that he's lying. You've got a gentleman who did 400 job searches for somewhere around a year. Was there a lot of them that he wasn't even qualified for? Well, maybe those that he searched at on his own after they ended. But if you read Hammond's deposition, you'll find that Simone and him, we did have a lot of jobs that he wasn't qualified for before they ever gave him the lease. And then you'll see that he applied at all of those jobs. Did he apply in person? I'm sorry? Did he apply in person for these jobs? No, he did not apply in person for many of them, or most of them, probably. But he also expressed at trial he was willing to move. And that's part of why he did apply at some of these jobs that they referenced that were out of his immediate area. These vocational people like for these people to apply outside the area when they want them to. But then they turn around and they're critical of them whenever they decide to search outside that area on their own. And they try to say that it's not a genuine job search. In all fairness, without getting you sidetracked with a lot of questions, can you summarize why specifically you believe the commission's decision was against the manifesto of the FI's? I think it is against the manifesto of the FI's. Because the only thing that they considered in their decision seemed to be the credibility of Dr. Shinwer. They completely disregarded any reference, except for two sentences, Dolores Gonzalez of Dr. Euclid's, of Dr. Gornet's opinions. And the issues that they raised about petitioner's credibility had nothing to do, in my opinion, with the issue at hand. And that being whether he was employed. Well, they were certainly aware of Graham's opinion that your client was abusing likeness. Also aware of his opinion that your client was engaged in symptom magnification. Wasn't it? Is that noted in there? OK. But look at, see if they considered Dr. Davey, who continued to give this gentleman prescriptions. They also didn't know Dr. Euclid's. After things fell apart with Dr. Graham, he sent this gentleman to Dr. Davey, after Dr. Graham, the treating surgeon did so. And they failed to acknowledge some of those issues. Well, I think they were, well, Graham was well aware of the fact that he was getting Vicodin from two physicians. And one of them didn't know he was getting it from another physician. I still don't think that that has any effect on whether this gentleman can work in that. That's the crux of it. Well, if a man's injured at work, and the only reason why he can't work is because he's abusing narcotics, do you think he's entitled to recover under an OGLOT theory? I don't think that that's in the record, Your Honor. That's not in the record. That that's the only reason he was unable to work is because he's abusing narcotics. Now, if a person were just abusing narcotics, then that's the only reason they were unable to work. I would tend to agree with you. But that's not what the evidence suggests. And as I said, after he had the issue with Dr. Graham, and Dr. Graham gave that opinion about the overuse of medications, Dr. Euclid sent him to another pain management guy, who never said that, and in fact, said the gentleman has a diagnosis of belt neck surgery syndrome, and continued prescribing medications. And again, my client didn't lie about that when he was asked about that on the stand. In his letter to Dr. Schwinnerwerk, did he also include a phrase that said, please don't put anything in the letter that the insurance company could contradict? He certainly did not write that at the suggestion of counsel. He was unrepresented at the time of those letters being written. Do you have to be represented when you tell lies? Or ask other people to tell lies? It only counts if you have a lawyer? No, I don't think that's a lie, with all due respect, Your Honor. I don't think he's telling the doctor to lie. And in fact, I think the doctor, in order to avoid that insinuation, said, no, I'm not going to do it until you come in for an examination. By the way, the next phrase says, my lawyer has said that it only needs to say that the patient is permanently and totally disabled. I can assure you, Your Honor, he was not formally represented at that time. And I had had no conversations with this gentleman. I'm the only counsel of record on this case. Whether he was seeking it elsewhere, I don't know. You know, the fact of the matter is, this gentleman asserted work. He does have restrictions that the commission ignored. He did search for work. He did sustain his burden of proving, by preponderance of the evidence, that he was unemployable, based on the outlaw category. And the employer failed to prove that he was employed. If we look to see what they say he was employable doing, it's two assembly jobs. That's all. They came up with assembly jobs as something he could do. Yet there were only two assembly jobs in all the 400 places that Hammond and Simone had sent him to? I think that's the kind of thing that needs to be given weight. At least the commission should have given some indication that they considered this. But it looks to me like they went into this with the preconceived notion that they were going to write this thing to deny permanent total disability. Went through and picked out a few facts. That when you look at the manifesto of the evidence, that's the whole assembly carrying away. Don't have anything further. Counsel, please. Good morning. My name is Michael Holtz, and I represent the employer in this appeal. Listening to questions from the court and Mr. Kirkpatrick's responses, it's clear to me he's arguing evidence. You may disagree with what the commission did here, and obviously, because we're here on appeal. But the issue is not what the individual court members might write in this case if they were the fact finder. The issue before this panel is whether the commission's decision is against the manifest way of the evidence. That's a very difficult burden, as it should be in an appellate court. Mr. Houston's not being denied. He's not being left empty handed here. The arbitrator awarded permanent total to him, which was about $1,000 per week. That was his TDD rate. What the commission did was set that aside for various reasons I'll get into, and they awarded him a max rate wage differential, which was about the applicable max rate at the time was $550.47. So Mr. Houston does have, going forward from the date of trial, and even going back in time, this wage differential award, which the commission awarded to him. So he does have that. Also, he has open medical rights. Is any of that really relevant to our inquiry? Our inquiry is whether the denial of odd laws against the manifest way of the evidence, what he gets, what he doesn't get. Sure, he gets medical. He doesn't get medical. To me, it's rather irrelevant to that question. I thought it was important to point out briefly at the beginning that he is getting the 8D1 award, which is one of the proper statutory findings the commission can make in a case like this. The second, and that's the primary finding of the commission, was setting aside the PERM total award and giving him the 8D1 award. The second finding was they basically determined his job search efforts were not genuine. And the consequence of that was they set aside a bunch of maintenance benefits and went back to the date that Dr. Euclid determined MMI, which is sometime in April 2006. So from April 2006 forward through the date of trial, which was May of 2009, they took away from him the TTD and said, no, you get a wage differential award, going back from the MMI declaration date, moving forward and again into the future. Those are the two key findings of the commission, which were different from the arbitrator. There was an initial TTD award from the date of accident through MMI, and the commission affirmed that. And we have no quarrel with that from the employer's perspective. But on the two key findings of setting aside the permanent total award and basically saying that Mr. Houston, his efforts with folk rehab were disingenuous or not genuine, those two key findings are not against the manifest way of the evidence. And we are asking simply that this court affirm the commission's finding. There have been some questions about Mr. Houston's credibility. Those are statements in the commission decision. And the commission made detailed findings. If you take the chance to read what the commission did here, they wrote six or seven pages of detailed findings of fact. And I think overall, they covered the basis. They obviously were persuaded by the evidence that the employer introduced about the double dipping of the pain medications. Mr. Houston did that over a number of months with two different physicians, both the first doctor, the pain management doctor, and then the second pain management doctor. And then there was even an ER visit where he went and got additional pain medications. And the commission looked at that in terms of Mr. Houston's credibility. And that started, I believe, the process of unraveling of this permanent total award. How do you respond to this argument? Your opponent seems to be saying, all right, perhaps the claimant did some things and said some things that, in hindsight, the commission could question. But then they sort of got distracted and went off and ignored the evidence in support of the diligent job search in the ad lot. So what's your response to that argument? Well, I think they can't be divorced, first of all. I think whether a petitioner is merely going through the motions of voc rehab or genuinely participating in voc is a state of mind, is something that is difficult for us to look at, because we can't get into somebody's state of mind. But we can look at that person's conduct over time and ask the question, in a totality, did this person cooperate with his physicians? Did this person cooperate with vocational rehabilitation? Or was there some other agenda that he had? And I think, ultimately, what the commission looked at was the, I call it a manifesto. That's derogatory, I know. But there was a six-page letter that he wrote in Dr. Shinnerwerk's deposition. It's an exhibit. And it includes that quotation that's in the brief. And your honor read from about, please don't put anything in your note that the insurance company can contradict. And it needs to say exactly this. And Mr. Houston knew what he was doing, apparently, because he's consulting with a lawyer. And it's not Mr. Kirkpatrick. I don't want to say that at all. He's consulting with some lawyer that's guiding him in this process. So what we have is a gentleman obtaining an opinion of permanent total disability for purposes of litigation from his physician, Dr. Shinnerwerk. But there's nothing inherently wrong with the lawyer or the petitioner asking the doctor to write me a, if this is what you believe, write me a report that says that. When I came across this letter in deposition, it was a jaw-dropper. And you got the whole letter there. I got the whole letter. It's in the record. But again, this goes to the state of mind of Sam Houston and whether he's genuinely cooperating with vocational rehab. At the time, we're paying him $1,000 plus a week in maintenance. And at the same time we're doing that, unbeknownst to us, he's going to Dr. Shinnerwerk and asking for him to write a permanent total disability opinion. And it taints the whole process. And that's what the commission is really latching onto. Well, there's nothing wrong with him going to Shinner and asking him to write a permanent total disability letter. I think what's wrong is when he tells him, but you don't have to tell the whole truth. Well, you've got to take the whole letter in context. I understand patients go to doctors and ask them, doctor, I don't believe I can work. I got this worker's comp case. I need you to write an opinion. But it's an opinion reached within a reasonable degree of medical certainty. It's not one that results from the pressure that a patient places on that doctor. And it's a genuine medical opinion. The bottom line is the opinion's tainted. It's one that the commission believed was generated for purposes of litigation, not a true genuine opinion. So it therefore taints the process. And just on this vote question, we have competing vocational opinions, one from Ms. Gonzalez and one from Ms. Hammond. And again, I go back to my initial argument whether the court would agree with Ms. Gonzalez versus Mr. Hammond is not the issue. For whatever reasons, and they're set forth in pretty good detail, the commission went with Mr. Hammond over Ms. Gonzalez and believed Mr. Hammond over Ms. Gonzalez that Mr. Houston did not participate in the vote process in good faith, and that while he has 400 job searches, there's problems with the quality of those job searches. So in the final analysis, the commission decided to accept Mr. Hammond's opinion that he was employable in the open labor market, albeit at $9 an hour, a very small rate. And what that translated to was a max rate wage differential under 8D1. And that's what they gave to him. So I believe the commission, from its decision, which was multi-pages, went to great length to look at this evidence, and carefully weighed it, and decided in the end that a perm total award, which the arbitrator gave Mr. Houston, was not appropriate. And I believe, in the final analysis, it's not against the manifest way of the evidence. And I'm asking this panel to confirm the commission award. Thank you. Mello? Thank you. I would like to address something that Justice Hoffman indicated. I assume, Justice, you're talking about where it says in Mr. Houston's letter, please don't put anything in it that the insurance company can contradict. In the next sentence. In the next sentence, my lawyer has said, by saying, please don't put anything in it that the insurance company contradicts, I don't think that that's asking the doctor to lie, or not tell the whole truth. Do you believe also? I don't believe so. And I would take issue with that, simply because, to me, that says, don't put something in there that isn't true, that the insurance can say, no, that's not true. That's what I think it means by that the insurance company can contradict. I'm sorry? You don't really believe that? Yes, I do. Well, you read that letter? I'm talking about this sentence right here. Have you read the letter? Yes, I've read the letter. Do you actually believe that? What you just said after reading that letter. I believe, Your Honor, that he was asking, in the best way a lay person could know how, to ask for an opinion from his doctor about permanent total disability. And I do believe, with a straight face, that where it says, don't put anything in there that the insurance company can contradict, I think he's wanting the doctor to only put in the facts, and only put in what the doctor believes to be true, not something that the insurance company can come back and point out against him. That's the way I read it. I would expect you, as his lawyer, to believe that. Well, I think that it's subject to interpretation, Your Honor, and I hope these other gentlemen might agree with me. One thing the counsel pointed out, he said that him and the commission commented on the problems with the quality of the job searches. Maybe he didn't apply to all of these in person, as they suggested. But I want to remind you, gentlemen, that 400 of these places were given to him by Bob Hammond and Lisa Simone. They were given to Mr. Houston by the people the insurance company hired to help him find work. And they let him go through not 10 places and decided to cut him off. They went through 400 places. And then they decided, since this guy's not finding a job, we'd better be doing something about this, because we don't want to pay ourselves into a firm total. They cut him off, and they reinvented the wheel, going backwards. That is the practicality of what happened. They provided him 400 places after they weeded out an untold number of jobs to give to this gentleman. And I just don't see how a person can be disingenuous over a job search of 400 places provided to you by counselors that you met with every week or every other week. Well, it's a diligent job search. So what did he do? He's got 400 names and addresses of people who have potential employment available. What they would do, Your Honor, they give these job searches to him, these places that they have pre-screened, essentially, and said, here, go apply here. He sends in an application. He calls. He applies online. It's various ways. But they give them to him. There are jobs that they think he can do. Now, all this about he's not applying at places that he should have been applying to, in their opinion, with management and things. OK, he's trying to go out and do his own job search. Yeah, a guy who's been making about 1,500 a week doesn't want to do stuff at McDonald's. But if you look, they weren't even looking at McDonald's. They're looking at factory places, making sandwiches. They're looking at places that paid primarily in the $10 an hour range, somewhere like that. They give these to him. It's his responsibility to apply. They had plenty of time to work with him and say, you're not doing it correctly. But they didn't. So I submit that that means they didn't have any problem with this guy until it got to be a lot of places. That's all that I have. Clerk will take the matter under advisement for disposition. We'll stand recess for a short period.